**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NOREEN C. LANAHAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 16 C 11723 |
| | ) | |
| COUNTY OF COOK, d/b/a COOK | ) | Judge John J. Tharp, Jr. |
| COUNTY HEALTH AND HOSPITAL | ) | |
| SYSTEM, TONI PRECKWINKLE, | ) | |
| PATRICK BLANCHARD, JOHN JAY | ) | |
| SHANNON, GLADYS LOPEZ, | ) | |
| DOUGLAS ELWELL, EULA CISCO, | ) | |
| EKERETE AKPAN, DEBORAH | ) | |
| COHEN, and ANDREW JESTER, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Noreen Lanahan is an employee of the Cook County Health and Hospital System ("CCHHS") who alleges that she has been grossly underpaid for the better part of a decade and that after she raised concerns that her salary was the product of gender and political-based discrimination, she became the target of retaliation. She brings suit against a host of defendants, including the management and human resources staff at CCHHS, the Independent Inspector General of Cook County and his staff, the President of the Cook County Board of Commissioners, and Cook County itself. Before the Court are two partial motions to dismiss Lanahan's amended complaint. The defendants contend that five of Lanahan's "claims" (more on the use of that term later)—First Amendment and Title VII retaliation, due process, gross negligence, and respondeat superior—do not withstand scrutiny under Federal Rule of Civil Procedure 12(b)(6). Having reviewed the parties' submissions, the Court grants in part and denies in part the motions to dismiss.

# BACKGROUND

## I. The Shakman Decree

Because Lanahan is a Cook County employee who alleges that she was retaliated against, in part, for raising concerns about political-based discrimination, this case requires some familiarity with what is known as the *Shakman* consent decree. In 1969, Michael Shakman and another plaintiff brought suit in the Northern District of Illinois challenging political patronage practices in the City of Chicago and Cook County. *Shakman v. Democratic Org. of Cook Cnty.*, 481 F. Supp. 1315, 1320-21 (N.D. Ill. 1979), *vacated sub nom.*, *Shakman v. Dunne*, 829 F.2d 1387 (7th Cir. 1987). In 1972, the *Shakman* defendants entered into a consent decree prohibiting them from "conditioning, basing or knowingly prejudicing or affecting any term or aspect of governmental employment, with respect to one who is at the time a governmental employee, upon or because of any political reason or factor." *O'Sullivan v. City of Chicago*, 396 F.3d 843, 848 (7th Cir. 2005) (discussing history of *Shakman* decree). The decree was later broadened to eliminate political influence over hiring practices. *Id.* at 848-49. The import of the *Shakman* decree is that, with the exception of certain exempt positions, it is presently unlawful for Cook County to take political considerations into account in any employment actions, such as recruitment, hiring, promotions, terminations, or transfers. *Shakman v. Democratic Org. of Cook Cnty.*, 569 F. Supp. 177 (N.D. Ill. 1983).

A Supplemental Relief Order ("SRO") also was entered in the *Shakman* litigation, which establishes a process for investigating and adjudicating claims of political discrimination or retaliation reported by county employees. (Suppl. Relief Order for Cook Cnty., ECF No. 41-1.)

The SRO provides that the Cook County Office of Independent Inspector General ("OIIG")[1] is responsible for investigating any claims that arise after February 2, 2007. (*Id.* at 18-19). The OIIG is required to issue findings on those claims to the *Shakman* compliance administrator (who oversees the SRO on behalf of the *Shakman* district court) and others for further action. (*Id.* at 21.) The SRO also provides claimants with the option of seeking a settlement conference with Cook County. (*Id.* at 23.) If the settlement conference is unsuccessful, claimants may proceed further to a binding arbitration on their claims. (*Id.* at 23-26.) With this background in mind, the Court turns to the allegations in the amended complaint.

## II.    Factual Background[2]

Lanahan has been an employee of the CCHHS since 1995. (Am. Compl. ¶ 22, ECF No. 40.) She was hired initially as a Grade 24 Director of Financial Control II, but her position was reclassified in 2008 to Director of Financial Control IV. (*Id.*) Lanahan continues to fill this position today and her annual salary has remained set at $101,000 since 2008. (*Id.*) Beginning in or around 2009, Lanahan sought a pay increase after discovering that one of her male subordinates, Chris Soriano, was being paid more than she and after she took on some additional responsibilities. (*Id.* ¶ 27.) Over the next few years, Lanahan submitted numerous requests for a raise to her supervisors and management, but to no avail. (*Id.* ¶ 28.) In August 2014, she contacted Defendant Gladys Lopez, CCHHS Chief of Human Resources, to express her

---

[1] The SRO refers only to an "Inspector General." However, the OIIG was created, in part, to fill this role. *See* Cook Cnty., Ill. Code of Ordinances § 2-283, *available at* https://library.municode.com/il/cook_county/codes/code_of_ordinances.

[2] Except where noted, the facts in this section are drawn from Lanahan's amended complaint or documents attached as exhibits to the amended complaint. The Court must accept the allegations in the complaint as true for purposes of the defendants' Rule 12(b)(6) motions. *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 915 (7th Cir. 2013). Moreover, because Lanahan refers to the exhibits in her pleading, (*see* Am. Compl. ¶¶ 21, 50, 53, 89), and relies on them to support some of her claims, the Court may draw facts from her exhibits as well, *Williamson v. Curran*, 714 F.3d 432, 435-36 (7th Cir. 2013).

frustration about the lack of consideration given to her requests for a raise. (*Id.* ¶ 29.) Lopez directed Lanahan to Jennifer Purcell, a human resources staffer. (*Id.*) Over the next two weeks, Lanahan discussed her "pay discrimination issue" with Purcell via email. (*Id.* ¶¶ 29-30.) Among other points of discussion, Lanahan informed Purcell about how her male subordinate was being paid more than she and about how she was asked to assume additional responsibilities from another male employee who also earned more than she did. (*Id.*)

A few weeks later, on September 12, 2014, Lanahan met with Defendant Eula Cisco, CCHHS Manager of Human Resources, to discuss her compensation. (*Id.* ¶ 31.) Cisco informed Lanahan that, for Grade 24 employees at CCHHS, "employment considerations" remained "exclusively at the discretion of the President of the Cook County Board of Commissioners," a role filled then and now by Defendant Toni Preckwinkle. (*Id.* ¶¶ 11, 31.) According to Cisco, to secure a pay raise, Lanahan needed either political influence or to file a claim for political discrimination pursuant to the *Skakman* SRO. (*Id.* ¶ 31.) In early October 2014, Lanahan met with Defendant Douglas Elwell, CCHHS Deputy Chief Executive Officer, to further discuss her compensation. (*Id.* ¶ 33.) Around the same time as her meeting with Elwell, Lanahan learned that Robert Vais, the only other Director of Financial Control IV at CCHHS (*i.e.*, her only peer), was earning an annual salary of $138,000. (*Id.*) Then, a few weeks after her meeting with Elwell, on October 22, 2014, Lanahan learned that her position was included on an Amended Severance Policy list, which reclassified her position from being merit-based to at-will. (*Id.* ¶ 35.)

On October 23, 2014, Lanahan brought up the Amended Severance Policy list with Elwell. (*Id.* ¶ 37.) Elwell responded that her reclassification "ha[d] nothing to do with [her] complaint" but promised to investigate the issue further. (*Id.*) After receiving no further explanation, Lanahan contacted the *Skakman* compliance administrator. (*Id.* ¶ 39.) She then

filed, through counsel, a formal complaint with the OIIG on December 19, 2014. (*Id.* ¶ 41.) In her OIIG complaint, Lanahan asserted a claim for unlawful political discrimination based on the influence of elected county officials over her salary and because she had been forced to take on additional responsibilities of more politically-connected employees. (*Id.* ¶¶ 41-42.) Lanahan also alleged that her inclusion on the Amended Severance Policy list was retaliation for her complaints about her unequal pay. (*Id.* ¶ 42.)

The OIIG investigated Lanahan's claims and, on May 18, 2015, issued a report of its findings. (*Id.* ¶¶ 44-45; OIIG Investigation Report, ECF No. 40-6 (hereafter "OIIG Report").) In its report, the OIIG concluded that the unlawful political discrimination claim was untimely. (OIIG Report at 4-5.) It found that because Lanahan first learned that she had been unfairly compensated in or around 2009, her complaint was not filed within the 120-day limitations period set by the SRO. (*Id.*) The OIIG also rejected Lanahan's retaliation claim, concluding that the addition of her position to the amended policy list was not an adverse action. (*Id.* at 5.) That is, her status as a "career service" employee was not affected by the list because it did not apply to individuals, like Lanahan, who were hired before June 30, 2010. (*Id.* at 5-6.) According to Lanahan, the OIIG Report is "inherently false, misleading" and was "authored with an intent to deceive." (Am. Compl. ¶¶ 44-45.) She believes that the report does not include a complete recitation of the facts, excludes certain payroll records and other evidence that supports her pay disparity allegations, misstates controlling legal doctrines, and improperly ratifies the decision to strip her of her merit protection. (*Id.* ¶¶ 45-51.)

Following the release of the OIIG's findings, Lanahan elected to pursue her claims through arbitration. (*Id.* ¶ 52.) On March 16, 2016 and June 1, 2016, Lanahan, represented by counsel, participated in an arbitration hearing during which she had an opportunity to present

witnesses and evidence. (*See* Mem. Op. & Order at 3, ECF No. 41-5.)[3] In September 2016, the arbitrator issued a ruling in which he concluded that Lanahan failed to make a *prima facie* case for unlawful political discrimination and, in a footnote, disposed of her retaliation claim on the same grounds as the OIIG. (*See id.* at 4-5.) The following month, on November 10, 2016, Lanahan filed a motion to vacate the arbitration award with the district court overseeing the *Shakman* decree. (*See id.* at 1.) Magistrate Judge Schenkier, who has presided over the *Shakman* litigation by consent since July 2010, denied Lanahan's motion on March 9, 2017, finding that none of the issues she raised justified vacating the award. (*Id.* at 5-9.)

Around the time of the OIIG's investigation and the arbitration proceeding, Lanahan alleges that she was subjected to several more adverse actions. In or around March 2015, during the OIIG's investigation, Elwell eliminated Lanahan's reserved handicapped parking space and reassigned it to another employee who did not have a disability. (Am. Compl. ¶ 78M.) Shortly after the OIIG Report was released in May 2015, Defendant Ekerete Akpan, the Chief Financial Officer of CCHHS, informed Lanahan that she was being relocated to another facility, which added an additional 90 minutes to her daily commute. (*Id.* ¶¶ 14, 78N.) Then, in March 2016, Akpan informed Lanahan that her position would undergo further change; her subordinates would be reorganized and relocated to a different facility than the one at which Lanahan worked. (*Id.* ¶ 78O.)

---

[3] The history of the Lanahan's arbitration proceeding is drawn from Magistrate Judge Schenkier's ruling on her motion to vacate the arbitration award in the *Shakman* litigation. Although the Court may, for certain purposes, take judicial notice of public court records in deciding a Rule 12(b)(6) motion, *see Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994), it need not do so here. The Court cites to the opinion merely to provide background for the OIIG Defendants' issue preclusion argument below.

### III.     Procedural Background

Lanahan filed this suit on December 30, 2016, asserting claims against Cook County and employees of the CCHHS and the OIIG. For clarity, the Court separates the defendants into three groups: (i) Cook County (the "County"); (ii) the Cook County Defendants, which includes Preckwinkle, Shannon, Lopez, Elwell, Cisco, and Akpan; and (iii) the OIIG Defendants, which encompasses Blanchard, Cohen, and Jester. The operative complaint was filed in March 2017. Although it comprises eight "counts," the complaint asserts two claims. The first is that Lanahan was undercompensated because of her gender. That claim is directed only at the County and is not the subject of the pending motions to dismiss.[4]

Lanahan's second claim is that she was retaliated against because of her complaints about her undercompensation. The retaliation claim is premised on Lanahan's complaints about her pay generally and in particular on her complaints that her undercompensation violated the *Shakman* decree. The retaliation theory is asserted against all of the defendants. In Count III, Lanahan asserts that the alleged retaliatory conduct violated the First and Fourteenth Amendments to the constitution and is actionable pursuant to 42 U.S.C. § 1983. In Count V, she alleges that the County is liable for the retaliatory conduct under Title VII, 42 U.S.C. § 2000e *et seq.* Count VI alleges that the OIIG defendants are liable for the retaliatory conduct under a state law theory of "gross negligence," and in Counts VII and VIII, she alleges that the County is liable for the retaliatory acts of the individual defendants under state law.

Shortly after the amended complaint was filed, the OIIG Defendants moved pursuant to Rule 12(b)(6) to dismiss Lanahan's claims (identical as to each of them) on the ground that the

---

[4] Although not required to identify in her complaint specific legal theories that support her claim, Lanahan asserts that she was undercompensated in violation of the Equal Pay Act, 29 U.S.C. § 626(b) (Counts I and II) and Title VII, 42 U.S.C. § 2000e *et seq.* (Count IV).

amended complaint does not state a claim against any of them upon which relief may be granted. The County and the Cook County Defendants also moved pursuant to Rule 12(b)(6) to dismiss the retaliation claims against them.[5]

## DISCUSSION

All of the defendants argue that Counts III, V, VI, and VII—*i.e.,* the retaliation claim— should be dismissed with prejudice pursuant to Rule 12(b)(6). To overcome a Rule 12(b)(6) motion, "a complaint must 'state a claim to relief that is plausible on its face.'" *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). This Court "must accept as true all factual allegations in the . . . complaint and draw all permissible inferences" in Lanahan's favor. *Id.* (quoting *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 639 (7th Cir. 2015) (internal quotation marks omitted)). However, "[w]hile a plaintiff need not plead 'detailed factual allegations' to survive a motion to dismiss, she still must provide more than mere 'labels and conclusions or a formulaic recitation of the elements of a cause of action' for her complaint to be considered adequate under [Rule] 8." *Bell v. City of Chicago*, 835 F.3d 736, 738 (7th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 678).

---

[5] Count VIII asserts liability on the retaliation claim against the County based on state law that requires indemnification of employees found liable for conduct that was within the scope of their employment activities. The County does not seek dismissal of that count specifically, though it obviously fails if the retaliation claim fails.

# I.    Section 1983 and Due Process

Count III of the amended complaint invokes 42 U.S.C. § 1983, which provides a cause of action against a person, who, acting under the color of state law, deprives any individual of a right, privilege, or immunity secured by the Constitution and laws of the United States. *L.P. v. Marian Catholic High Sch.*, 852 F.3d 690, 696 (7th Cir. 2017) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)). Section 1983 does not vest plaintiffs with any rights, but rather provides them with the procedural mechanism for "vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 394 (1989) (citation omitted). Plaintiffs must identify the specific constitutional right that they believe was infringed. *Id.* Lanahan's § 1983 claim is principally based on alleged violations of her First Amendment right to free speech. She also refers in passing to an infringement of her right to due process.

Lanahan's due process theory can be easily disposed of because she fails to sufficiently allege the threshold requirement of a protected interest. *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569 (1972) (holding that due process applies to deprivations of liberty or property interests).[6] Her due process theory centers on the notion that the OIIG conducted a fraudulent investigation into her political discrimination and retaliation claims. The key allegation in the amended complaint, and the only one that even mentions due process, states:

> Defendants Blanchard, Cohen and Jester's bad faith dismissal of Plaintiff's retaliation allegation was, itself, retaliation and denied Plaintiff the protection afforded to employees who complain of illegal employment actions and abetted the County's retaliation against Plaintiff. The content and legal authority cited in the OIIG's Findings indicate a policy intent to deceive and dissuade reasonable employees with legitimate and well-founded complaints of discrimination from pursuing claims and/or delaying the same; thus, impairing due process rights.

---

[6] Lanahan does not clarify whether her due process theory is procedural or substantive. Because the OIIG Defendants regarded it as procedural, (OIIG Mot. 10-11, ECF No. 41), and Lanahan offers no objection to their classification, the Court will treat it as procedural as well.

(Am. Compl. ¶ 78K.) Nothing in this allegation, or anywhere else in the complaint, identifies a protected interest of which the OIIG supposedly deprived Lanahan by issuing a fraudulent report. The defendants, for their part, speculate at what the interest may be, arguing that Lanahan cannot establish a property interest in her employment or a pay raise. (OIIG Mot. to Dismiss 11, ECF No. 41). That strikes the Court as off-base; if retaliation takes the form of conducting a sham investigation, then it would seem that the interest implicated would be the interest in an investigation conducted in good faith.[7] But Lanahan does not address this argument and in the process fails to clarify her theory. To be sure, she does imply at one point that she has a protected interest in "her complaints of discrimination." (Pl. Resp. to OIIG Mot. to Dismiss 14, ECF No. 47.) But if that is the interest she is relying on, her theory is one of free speech not procedural due process. *See Roth*, 408 U.S. at 575 & n.14 (rejecting notion that due process requires hearing for college teacher whose non-retention was based on exercise of free speech); *Perry v. Sindermann*, 408 U.S. 593, 599 n.5 (1972) (stating that employee does not have due process right to hearing simply because adverse employment decision was based on employee's constitutionally protected conduct) (citing *Roth*, 408 U.S. at 575 n.14). Accordingly, the Court concludes that as presently pleaded, Count III does not adequately allege a due process violation and the retaliation claim cannot stand on that basis.

## II.  First Amendment – Retaliation

Turning to Lanahan's First Amendment theory, to state a *prima facie* claim for retaliation, she must sufficiently allege that: (1) her speech was constitutionally protected; (2) she suffered a deprivation likely to deter free speech; and (3) her speech was at least a motivating

---

[7] This is not to say that there is any such property interest; only that to establish a due process violation, it would seem that Lanahan would have to plausibly allege such a property interest. She has not even attempted to do so.

factor in the defendants' actions. *Peele v. Burch*, 722 F.3d 956, 959 (7th Cir. 2013) (quoting *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012)). The defendants attack this theory on multiple fronts. They first argue that, based on the facts alleged, Lanahan cannot establish retaliation because her speech was not protected and she cannot show that certain actions amount to a deprivation. Several of the Cook County Defendants also contend that they lack the requisite knowledge or involvement to be held liable under §1983, and the OIIG Defendants argue that qualified immunity shields them from liability. Finally, the County argues that it should be dismissed because Lanahan cannot meet the requirements of *Monell*. The Court addresses each of these arguments in turn, starting with protected speech.

## A.      Protected Speech

A threshold issue is whether any of Lanahan's speech merits protection under the First Amendment. Because Lanahan is a public employee, her speech is protected only if she spoke as a private citizen on a matter of public concern. *Kubiak v. City of Chicago*, 810 F.3d 476, 481 (7th Cir. 2016) (citing *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)). Whether speech is constitutionally protected is a question of law for the Court to decide. *Id.* (citing *Houskins v. Sheahan*, 549 F.3d 480, 489 (7th Cir. 2008)). Here, the Court must consider whether any of the pay and retaliation complaints that Lanahan raised to her supervisors, the human resources department, the *Shakman* compliance administrator, or the OIIG, constitutes protected speech.[8]

### 1.      Private Citizen

Lanahan's speech does not merit protection unless she was speaking as a private citizen, rather than as a public employee. Distinguishing between employee and citizen speech turns on

---

[8] To be clear, the Court's conclusions on this issue are based only on the limited record that may be considered on a motion to dismiss. This ruling does not preclude discovery relevant to these issues or a summary judgment motion that presents a more developed factual basis.

whether the plaintiff made the statements at issue pursuant to her official duties. *Lane v. Franks*, 134 S. Ct. 2369, 2378 (2014) ("[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.") (quoting *Garcetti*, 547 U.S. at 421). Defining an employee's duties "requires a practical inquiry into what duties the employee is expected to perform, and is not limited to the formal job description." *Houskins*, 549 F.3d at 490 (citation omitted); *see also Abcarian v. McDonald*, 617 F.3d 931, 937 (7th Cir. 2010) (adding that courts must look "to the employee's level of responsibility and the context in which the statements were made") (citation omitted). In short, the Court must determine "what [the plaintiff] was expected to do as an employee." *Kubiak,* 810 F.3d at 481.

Based on the allegations of the complaint, taken as true, the Court finds that Lanahan raised her pay and retaliation complaints as a private citizen, rather than pursuant to her official duties as a Director of Financial Control IV. At bottom, Lanahan sought through her complaints a pay increase and greater job security; those are issues personal to Lanahan and are not within the scope of the work she was expected to perform. *See Hill v. City of Chicago*, No. 09 C 6370, 2010 WL 3735723, at *5 (N.D. Ill. Sept. 15, 2010) (finding that employee spoke as private citizen when complaining to superiors and *Shakman* monitor about revoked job offer); *Fagbemi v. City of Chicago*, No. 08 C 3736, 2010 WL 1193809, at *12 (N.D. Ill. Mar. 19, 2010) (holding that employee complained to city officials, *Shakman* monitor, inspector general, and others as citizen when he raised concerns about the selection of another candidate over him for new position). The defendants counter, citing *Kubiak*, that Lanahan spoke out as an employee because she complained about being the subject of discrimination. (Cook Cnty. Mot. to Dismiss 5, ECF No. 46.) But *Kubiak* does not support the defendants' position. The case dealt with the reporting

of violent behavior by a fellow police officer; the Seventh Circuit concluded that as a police officer, reporting violent conduct by a fellow officer was "part of that job." *Kubiak*, 810 F.3d at 481-82. By contrast, so far as is evident on the limited record on this motion to dismiss, Lanahan's accounting responsibilities carried with them no similar responsibility to report discrimination by coworkers and supervisors. So while Kubiak's report concerning the violent behavior of her colleague was "intimately connected with her professional duties," *id.* at 482, there is no basis on the present record to establish any connection between Lanahan's complaints and her duties at the CCHHS. *Kubiak* is plainly distinguishable on this basis and the Court concludes that the complaint plausibly alleges that Lanahan spoke as a citizen for First Amendment purposes.

### 2. Public Concern

Although Lanahan spoke as a citizen, she was not speaking on matters of purely private concern. Speech concerns a public matter "when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate new interest; that is, a subject of general interest of value and concern to the public." *Lane*, 134 S. Ct. 2380 (internal quotation marks omitted) (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)). In addressing this question, courts look to the "content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147-48 (1983)). Content is the most important consideration, but the subject matter of the speech is not outcome determinative. *Kubiak*, 810 F.3d at 483 (citation omitted). Rather, courts must decide whether "the objective of the speech—as determined by content, form, and context—was to 'bring wrongdoing to light' or to 'further some purely private interest.'" *Id.* (citing *Kristofek v. Village of Orland Hills*, 712 F.3d 979, 985 (7th Cir. 2013)). Dovetailing with the court's analysis

above—but somewhat in tension with their view that Lanahan's complaints were within the scope of her public employment—the defendants argue that Lanahan's complaints involve purely personal concerns about her pay, job responsibilities, and employment status. (Cnty. Mot. 5, ECF No. 46.) Lanahan counters that although she had personal motives for raising her complaints, they nonetheless are a matter of public concern because she sought to expose the County's illicit political patronage practices. (Pl. Resp. to Cook Cnty. Mot. to Dismiss 4-5, ECF No. 48.) In the Court's view, Lanahan has the better of this argument.

At the outset, the Court agrees that Lanahan's initial complaints did not involve a matter of public concern. Through September 2014, Lanahan protested to her superiors and the human resources department about the fairness of her salary as compared to a male subordinate and about having to take on responsibilities from higher-paid, male coworkers without receiving additional pay. (Am. Compl. ¶¶ 27-30.) While "sex discrimination in public employment can be a matter of public concern[,] . . . it is not always so." *Gross v. Town of Cicero*, 619 F.3d 697, 706 (7th Cir. 2010) (citing *Kokkinis v. Ivkovich*, 185 F.3d 840, 844 (7th Cir. 1999)). Indeed, in *Snider v. Belvidere Township*, the Seventh Circuit upheld dismissal of a retaliation claim based on a similar sex-based pay grievance. 216 F.3d 616, 617, 620 (7th Cir. 2000). A female assessor in that case expressed displeasure during a public township board meeting about her salary being equal to a newly hired male assessor. *Id.* In holding that the assessor's aired grievance was not protected under the First Amendment, the court stated that although her speech touched on issues of sex discrimination, it still concerned only a personal matter because "[s]he simply wanted to be paid more than anyone else with less seniority." *Id.* The same is true of Lanahan's initial complaints; she merely sought to be paid more than her subordinates and to be compensated for her additional work. *See Gross*, 619 F.3d at 706 ("Purely personal grievances do not garner First

Amendment protection . . . ."); *Bohler v. Ill. Dep't of Corrs.*, No. 05-CV-1173, 2007 WL 1431867, at *4 (C.D. Ill. May 11, 2007) (finding that plaintiff's complaints about his salary to personnel department and others were personal and thus not a public concern). These early complaints do not support a conclusion that Lanahan was addressing a matter of public concern.

What alters the equation is Lanahan's complaint to the OIIG.[9] Looking first at the content of that complaint, Lanahan reported that the County was violating the *Shakman* decree because elected officials maintained control over her salary and because county employees had retaliated against her by stripping her merit-based protection. (*Id.* ¶¶ 41-42.) Such allegations of unlawful political discrimination and retaliation "charge a 'breach of public trust' of the sort that can qualify for constitutional protection." *Lewis v. County of Cook*, No. 10 C 1313, 2011 WL 839753, at *9 (N.D. Ill. Feb. 24, 2011) (finding that plaintiff's complaints about *Shakman* violations and SRO claim alleging unlawful political discrimination were matters of public concern); *see also McDonough v. City of Chicago*, 743 F. Supp. 2d 961, 973 (N.D. Ill. 2010) ("[W]hile general complaints about promotions, job assignments, and overtime are not necessarily matters of public concern by themselves, they may rise to the level of public concern if they involve decisions allegedly based on political considerations . . . .").

The form and context of the complaint is also important. Lanahan filed a formal charge, through counsel, to an independent investigative office using procedures laid out in an order issued by a federal district court. (Am. Comp. ¶ 41.) This complaint went far beyond raising a pay issue through her superiors or the human resources department. *See Fagbemi*, 2010 WL 1193809, at *13 (finding letters to federal monitor and *Shakman* compliance officer touched on

---

[9] The same might be said about Lanahan's discussion with the *Shakman* compliance administrator, but the amended complaint does not provide any detail about that conversation. As such, the Court does not rely on Lanahan's discussions with the compliance administrator in finding that her speech is protected at the pleading stage.

matters of public concern, in part, because they "occurred outside of 'the employer's personnel hierarchy'") (quoting *Taylor v. Carmouche*, 214 F.3d 788, 792 (7th Cir. 2002)). The history behind the *Shakman* decree further demonstrates why the complaint is a matter of public concern. As outlined above, the decree is designed to eliminate unlawful political influence in the County's employment practices. Given that the County for some time has been attempting to achieve substantial compliance with the decree, and thereby obtain a release, an employee's claim that county officials unlawfully retaliated against her for complaining about political practices barred by the decree raises concerns beyond that employee. *See Lewis*, 2011 WL 839753, at *10; *Fagbemi*, 2010 WL 1193809, at *13 ("The context surrounding the *Shakman* consent decree . . . also indicates that complaints to the *Shakman* Compliance Officer are likely to implicate matters of public concern about the City's promotional practices at large."); *Hill v. City of Chicago*, No. 09 C 6370, 2010 WL 3735723, at *5 (N.D. Ill. Sept. 15, 2010) ("Whether the City is conforming its hiring and other employment practices to the *Shakman* Decree is not simply a concern for Hill, but a concern to anyone who seeks a position with the City.").

While it is true that Lanahan's motivation for filing her OIIG complaint was largely the same as when she raised her earlier grievances—she primarily sought a pay raise in both instances—that alone does not preclude characterization of her speech as involving a matter of public concern. *Kristofek*, 712 F.3d at 985 ("But even if Kristofek were motivated *exclusively* by his own self-interest, his First Amendment claim would not necessarily be dismissed. As we have stated before, motive alone does not conclusively determine whether a public employee's speech involves a matter of public concern.") (collecting cases). Nor is the Court convinced by the cases that the defendants cite for the proposition that Lanahan's OIIG complaint should be regarded as a private matter. Both *Gross*, 619 F.3d at 704-05, and *Phelan v. Cook County*, 463

F.3d 773, 790-91 (7th Cir. 2006), are distinguishable because neither case involved the filing of formal charges of unlawful political discrimination or dealt with the effect of the *Shakman* decree. As Magistrate Judge Schenkier aptly described the relevant considerations in *Lewis*, "allegations that, in essence, suggest that a public entity is not only violating the First Amendment by conditioning employment on political sponsorship, but also retaliating against the plaintiff for exercising rights that were specifically granted to her by the SRO—a court order that this same entity has agreed to follow," is quintessentially speech that implicates matters of public concern. 2011 WL 839753 at *10. The Court therefore concludes that Lanahan's complaint to the OIIG implicated a matter of public concern and, at the pleading stage, plausibly constitutes protected speech under the First Amendment.

## B.      Actual Deprivation

The defendants also raise two concerns about Lanahan's ability to show that she suffered a deprivation that is likely to deter free speech. First, the Cook County Defendants argue that Lanahan's allegation that she lost her merit-based protection is barred by the statute of limitations. (Cnty. Mot. 7, ECF No. 46.) Although this argument does not defeat the retaliation claim—Lanahan alleges several other retaliatory acts against the Cook County Defendants—it has merit. In Illinois, § 1983 claims are governed by a two-year statute of limitations. *See Williams v. Lampe*, 399 F.3d 867, 870 (7th Cir. 2005) (stating that limitations periods for § 1983 is based on Illinois' statute of limitations for personal injuries); 735 ILCS 5/13-202 (setting default limitations period of two years for personal injury claims). Lanahan alleges that she was stripped of her merit-based protection on October 4, 2014, when her position was added to the amended policy list, and learned about that list on October 22, 2014. (Am. Compl. ¶¶ 35, 38.) Because she waited until December 20, 2016 to file suit—over two years after she learned about

her alleged reclassification—she cannot rely on this adverse action to establish retaliation under the First Amendment.[10]

Second, the OIIG Defendants contend that Lanahan is barred from alleging that they engaged in any retaliatory acts by the doctrine of issue preclusion. That doctrine provides that "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Carter v. C.I.R.*, 746 F.3d 318, 321 (7th Cir. 2014) (quoting *Montano v. United States*, 440 U.S. 147, 153 (1979)). Lanahan's theory of retaliation against the OIIG Defendants is that they conducted a sham investigation into her *Shakman* claims. According to the OIIG Defendants, Lanahan cannot prevail on that theory because she pursued her *Shakman* claims further through arbitration and lost. (OIIG Mot. 5-7, ECF No. 41.)

To be clear, the OIIG Defendants do not contend that the retaliation claim asserted against them in this suit was actually litigated in the prior arbitration. And that is because they cannot; the retaliation claim Lanahan presented to the arbitrator was not premised on the quality of the investigation the OIIG conducted but rather on Lanahan's claim that she had been stripped of merit protection by some of the Cook County Defendants. (*See* Order at 5, ECF No. 41-5.) What the OIIG Defendants are really arguing is that Lanahan's corrupt investigation theory is baseless because the arbitrator reached the same conclusions as the OIIG Report (*i.e.*, that neither of Lanahan's *Shakman* claims had merit). Stated differently, they rely on the outcome of the arbitration—which survived a motion to vacate—as circumstantial evidence that their investigation was not carried out in a retaliatory manner.

---

[10] Lanahan argues elsewhere that the statute of limitations for her Title VII retaliation theory should be extended through equitable tolling and equitable estoppel. She does not raise those arguments here, but even if she had, the Court would reject the application of those doctrines for the same reasons it rejects their application to the Title VII retaliation theory below.

This argument misses the boat, essentially because it is an argument about evidentiary inferences not issue preclusion. The Court, of course, may not weigh evidence on a motion to dismiss, and in any event the evidentiary premise of the OIIG Defendants' argument is questionable at best. Although the arbitration may preclude the relitigation of issues presented in that proceeding, it does not compel the conclusion that the OIIG's investigation into those issues was above board. The amended complaint illustrates this point. Lanahan alleges that the OIIG tried to sabotage her *Shakman* claims by conducting a shoddy investigation and concealing payroll record from her. (Am. Compl. ¶¶ 44-47.) Even if the Court were to assume that the payroll records would not have altered the outcome the OIIG's investigation,[11] its concealment of evidence (assuming, as the Court must, the truth of that allegation) still could have deterred Lanahan, or others, from filing further *Shakman* complaints with that office. At bottom, Lanahan plausibly alleges a claim for retaliation against the OIIG Defendants based on their alleged evidentiary misconduct, regardless of whether they properly concluded that Lanahan's *Shakman* claims were not actionable. For this reason, the Court declines to dismiss Count III against the OIIG Defendants on the basis of issue preclusion.[12]

## C. Personal Knowledge and Involvement

The next challenge to Lanahan's retaliation claim is advanced by only three of the Cook County Defendants—Preckwinkle, Shannon, and Akpan. These defendants, who are all supervisors, contend that they should be dismissed from Count III because they lacked the

---

[11] The OIIG Defendants represent that they tendered the payroll records to Lanahan prior to the arbitration and that those records were available to the arbitrator when it rejected Lanahan's political discrimination claim on the merits. (OIIG Mot. 11-12 n.5, ECF No. 41.)

[12] The OIIG Defendants assert that "*res judicata* is also a possible defense" to Lanahan's First Amendment retaliation claim. (OIIG Reply at 4 n.1, ECF No. 52.) Because they raise this argument for the first time in their reply brief (in a footnote no less), the argument is waived. *See Palmer v. Marion County*, 327 F.3d 588, 597-98 (7th Cir. 2003) (explaining that arguments not raised in initial briefs are waived).

requisite knowledge and/or involvement to be found liable. Section 1983 does not recognize the doctrine of respondeat superior, so supervisors are liable only if they were personally involved in the constitutional violation. *Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017) (citation omitted). This means that supervisors "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye toward it for fear of what [they] might see." *Id.* (citation omitted). In the context of First Amendment retaliation, moreover, a supervisor must know about not only the retaliatory conduct, but also about the plaintiff's constitutionally protected speech. *See McGreal v. Village of Orland Park*, 850 F.3d 308, 313 (7th Cir. 2017) ("Allegedly protected speech cannot be proven to motivate retaliation, if there is no evidence that the defendants knew of the protected speech.") (quoting *Stagman v. Ryan*, 176 F.3d 986, 999-1000 (7th Cir. 1999)).

Preckwinkle contends that there is nothing in the amended complaint that establishes that she knew about Lanahan's grievances or was personally involved in the alleged acts of retaliation. The Court agrees with Preckwinkle in part. Contrary to her contention, the amended complaint clearly suggests that she knew about Lanahan's pay complaints. Indeed, Preckwinkle is copied on the OIIG Report, which details the allegations of political-based pay discrimination and retaliation. (OIIG Report at 6, ECF No. 40-6; *see also* SRO at 21, ECF No. 41-1 (discussing how Cook County Board President is required to receive findings issued by OIIG on *Shakman* claims).) This alone is enough to establish at the pleading stage that Preckwinkle knew about Lanahan's grievances.[13] Nonetheless, the amended complaint fails to adequately allege that Preckwinkle knew about, condoned, or turned a blind eye to any of the retaliatory acts. Lanahan relies on two sets of allegations here: that Preckwinkle was in a position to adjust her pay, yet

---

[13] Because Preckwinkle was copied on the OIIG Report, her argument that she was not—as the amended complaint alleges—copied on the October 2016 report issued by the Cook County Employment Plan Officer (the "EPO Report") is beside the point.

elected to "stonewall and deny" her requests, (Am. Compl. ¶¶ 32, 78C); and that Preckwinkle, as "one of the highest ranking" county officials, "engaged in, authorized, approved and established the widespread campaign of harassment and retaliation that was leveled at [her]," (*id.* ¶¶ 80-81). Neither set of allegations passes muster under Rule 12(b)(6); the first is fueled by speculation while the second is mere boilerplate. *See Adams*, 742 F.3d at 728 (stating that plaintiff must assert plausible theory of relief and do more than allege "conclusory statements") (citing *Iqbal*, 556 U.S. at 678).

Lanahan responds by asking the Court to look beyond the complaint to establish a connection between Preckwinkle and the alleged acts of retaliation. She points in particular to a compliance report filed in the *Shakman* litigation in April 2017, which, according to Lanahan, demonstrates an "ongoing institutional disregard" for her requests for a raise. (Pl. Resp. to Cnty. Mot. 7, ECF No. 48.) But even if the Court were to take judicial notice of this report, it is of no consequence. The report does not establish an institutional disregard of Lanahan's requests; rather, it merely cautions that "any institutional disregard of purportedly governing procedures [in the *Shakman* decree] opens the door to employment decisions based on unlawful political discrimination." (Seventeenth Shakman Report for Cook Cnty. at 10, *Shakman v. Democratic Org. of Cook Cnty.*, 69 C 2145 (N.D. Ill. Apr. 21, 2017), Dkt. 4984.) More importantly, the report says nothing about Preckwinkle's knowledge about any of the alleged retaliatory acts. In a last ditch effort, Lanahan urges the Court to "take judicial notice of an abundance of additional facts" that show Preckwinkle knew about or tactically condoned retaliation against Lanahan. (Pl. Resp. to Cnty. Mot. 8, ECF No. 48.) But she wholly fails to explain what those facts are, why they are not asserted in her complaint, and on what basis the Court may take judicial notice. Accordingly, the Court dismisses Preckwinkle in her individual capacity as to Count III.

The same, however, cannot be said of Shannon or Akpan. Shannon contends that he should be dismissed because there are no allegations showing that he was "personally involved in the decision making allegedly amounting to a violation of Plaintiff's constitutional rights or acquiesced in some demonstrable way in the alleged constitutional violation." (Cnty. Mot. 7, ECF No. 46.) But, as noted above, personal involvement is not required for a supervisor's liability under § 1983; it is enough that the supervisor know about the conduct and facilitate it, approve it, condone it, or turn a blind eye toward it. Shannon does not argue that Lanahan failed to adequately allege his knowledge, and the allegations of the complaint provide more than a conclusory basis that Shannon not only knew about the events at issue, but condoned them. In particular, Lanahan alleges that Shannon knew of her complaints, at least as they were described in the EPO Report. (Am. Compl. ¶ 78B.) That report, which was addressed to Shannon (and Lopez), described Lanahan's complaints of discrimination and retaliation, her SRO complaint, and the OIIG investigation, and concluded, among other things, that the CCHHS had made Grade 24 compensation decisions "without any written policy or process to guide them," in violation of a county ordinance. (EPO Report 1-4, 6-7, ECF No. 40-3.) The report also confirmed that "[t]he Chief Executive Officer (CEO) approved Grade 24 salary increases[,]" (*id.* at 4), a statement directly implicating Shannon in the events that produced the pay discrepancy between Lanahan's salary and that of Vais. These allegations are hardly definitive as to Shannon's involvement or responsibility for the events at issue, but they suffice to make Lanahan's claim that Shannon, at the very least, knew of and condoned at least some of the conduct on which her complaints were based.

Akpan contends that he lacked knowledge of Lanahan's complaints rather than dispute that he was personally involved in some of the alleged misconduct. This argument fails as well

because there is enough in the complaint to infer that Akpan knew about Lanahan's *Shakman* grievances. The complaint alleges that Lanahan brought up her requests for equal compensation "numerous" times with her "supervisors and management" between 2009 and 2014. (Am. Compl. ¶ 28.) It is plausible, given his position as CFO of CCHHS (*id.* ¶ 14.), that Akpan was among the supervisors with whom Lanahan spoke. The complaint further alleges that shortly after the OIIG released its findings, Akpan retaliated against Lanahan by requiring her to report to another CCHHS facility further away from her home. (*Id.* ¶ 78N.) Given the timing of the move and Akpan's likely knowledge about the prior equal pay complaints, it is plausible to infer that he also knew about the political-based complaints Lanahan raised with the OIIG. The Court therefore denies Shannon and Akpan's motions to dismiss Count III.

## D. Qualified Immunity

Next, the OIIG Defendants argue that they cannot be held liable for First Amendment retaliation because of qualified immunity. Qualified immunity arises when an official's conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (internal quotation marks and citation omitted). "Qualified immunity is an affirmative defense, but the plaintiff carries the burden of defeating it once raised." *Elwell v. Toney*, 853 F.3d 911, 919 (7th Cir. 2017) (citation omitted). To overcome a qualified immunity defense, "a plaintiff must show: (1) that the defendant violated a constitutional right, and (2) that the right was clearly established at the time so that it would have been clear to a reasonable [official] that her conduct was unlawful in the situation." *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001)).

Although the OIIG Defendants discuss qualified immunity in their motion, the Court declines to consider the defense at this time. For starters, the argument was initially raised in the

wrong context. The defendants asserted qualified immunity in their opening brief only as to Lanahan's gross negligence theory. (OIIG Mot. 13. ECF No. 41.) Not until their reply did the defendants attempt to extend their immunity defense to the First Amendment theory. (OIIG Reply in Supp. of Mot. to Dismiss 12-13, ECF No. 52.) The argument also is woefully undeveloped. The defendants in their opening brief do little more than recite the requirements for qualified immunity and insist that the defense applies. (OIIG Mot. 13, ECF No. 41.) Although they add some color in their reply—arguing that "retaliatory investigation is not a clearly recognized tort," (OIIG Reply 4, 13, ECF No. 52)—the addition is too little too late.[14] *See Palmer*, 327 F.3d at 597-98. In sum, the defendants bear the initial burden to properly put the defense of qualified immunity before the Court, and they have failed to so here. *See, e.g.*, *Hood v. Smith*, No. 15 C 7945, 2017 WL 2404974, at *3 (N.D. Ill. June 21, 2017) (declining to address cursory and underdeveloped arguments on qualified immunity); *Curtis v. Wilks*, 704 F. Supp. 2d 771, 786-87 (N.D. Ill. 2010) (stating that litigant who fails to apply law to the facts "in any meaningful fashion" waives argument). Thus, Lanahan's First Amendment theory of retaliation is not foreclosed by qualified immunity at this stage.[15]

---

[14] Moreover, the OIIG Defendants' assertion that "[t]he Supreme Court has held that a retaliatory investigation alone is not sufficient to support a first amendment retaliation claim," (OIIG Reply 4, ECF No. 52), badly misconstrues a footnote from a case in which the Court left open the question of "[w]hether the expense or other adverse consequences of a retaliatory investigation would ever justify recognizing such an investigation as a distinct constitutional violation," *Hartman v. Moore*, 547 U.S. 250, 262 n.9 (2006). In any event, the context in *Hartman* was decidedly different; that case addressed a "retaliatory investigation" as a precursor to a retaliatory prosecution, whereas here the claim is not that Lanahan was being investigated in an effort to retaliate against her for her speech, but that her claims were being sabotaged by an investigation conducted shoddily as a means of retaliating against her. Neither party has identified any case law addressing the viability of a retaliation claim in this specific context.

[15] This ruling does not itself preclude any defendant from asserting a qualified immunity defense on summary judgment.

### E.     Monell Liability

Finally, the County seeks dismissal of Count III. While the County is subject to suit under § 1983, it may be held liable only by way of *Monell v. Department of Social Services*, 436 U.S. 658 (1978). *Monell* requires that a plaintiff plead and prove that she was injured not by the unlawful actions of the County's agents, but rather by (1) the enforcement of an express policy, (2) a widespread practice, or (3) a person with final policymaking authority. *Estate of Sims ex. rel. Sims v. County of Bureau*, 506 F.3d 509, 514-15 (7th Cir. 2007).[16] The plaintiff also must show that the official policy or practice was the direct cause or driving force behind her constitutional injury. *Dixon v. County of Cook*, 819 F.3d 343, 348 (7th Cir. 2016). Lanahan asserts two grounds for *Monell* liability, but neither is viable.

She first contends that a person with policymaking authority for the County, namely, Inspector General Blanchard, caused her constitutional injuries by spearheading the fraudulent investigation into her *Shakman* claims. (Pl. Resp. to OIIG Mot. 7-9, ECF No. 47.) "It is well-established that when a particular course of action is directed by those who set municipal policy, the municipality is responsible under section 1983, even if the action in question is undertaken only once." *Valentino v. Village of S. Chicago Heights*, 575 F.3d 664, 675 (7th Cir. 2009) (citation omitted). Lanahan's argument fails at the outset because she cannot show that Blanchard set the policy at issue; namely, how complaints of political discrimination are handled. That policy is set forth in the *Shakman* decree. Despite what Lanahan may think, the decree (and the SRO) is what embodies the County's policy of investigating claims of political

---

[16] Lanahan asserts her § 1983 theories against all of the OIIG and Cook County Defendants in their official capacities as well. Because these theories are indistinguishable from the ones asserted against the County, *Walker v. Sheahan*, 526 F.3d 973, 977 (7th Cir. 2008) ("Actions against individual defendants in their official capacities are treated as suits brought against the government entity itself.") (citation omitted), the Court need not address separately the § 1983 theories asserted against the individual defendants in their official capacities.

discrimination and retaliation. Indeed, the SRO sets out the basic framework for how such claims are to be handled. (SRO at 18-21, ECF No. 41-1.) What Lanahan is really alleging is that Blanchard and the OIIG have run afoul of the *Shakman* decree by investigating her and other employees' claims in a fraudulent and vindictive manner. While such allegations could open Blanchard up to personal liability, they do not bring the County within reach. *See Auriemma v. Rice*, 957 F.2d 397, 400 (7th Cir. 1992) ("Liability for unauthorized acts is personal; to hold the municipality liable, *Monell* tells us, the agent's action must implement rather than frustrate the government's policy."); *see also Lanton v. City of Chicago*, No. 16 C 2351, 2016 WL 4378973, at *6 (N.D. Ill. Aug. 17, 2016) (dismissing *Monell* claim against city for equal protection and due process violations based on city's enforcement and application of *Shakman* decree because department commissioner misapplied rather than implemented decree in first instance).

Lanahan's other basis for *Monell* liability is that the OIIG had a widespread practice of improperly dismissing *Shakman* complaints on timeliness grounds in order to limit the County's liability for political discrimination. (Pl. Resp. to OIIG Mot. 9-11, ECF No. 47.) This fails for several reasons. First, Lanahan does not adequately allege that the OIIG has a widespread practice of improperly dismissing complaints. Lanahan relies almost exclusively on a footnote in another compliance report filed in the *Shakman* litigation, which states:

> The [compliance administrator] notes that some [*Shakman*] complaints were dismissed by the OIIG for statute of limitations-type issues. The County has notified the [administrator] that it is in the process of settling some of these complaints despite the OIIG's negative findings.

(Eleventh Shakman Report for Cook Cnty. at 21 n.3, ECF No. 41-6.) The Court does not read this footnote as an admission by the County that the OIIG has been time-barring claims at a rate so extensive that it carries the force of policy. *See Rice ex. rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 675 (7th Cir. 2012) (stating that widespread practices must be "so entrenched and well-

known as to carry the force of policy"). Lanahan's only other support is her own allegation that she was a victim of the OIIG's dismissal practice. But whether read in isolation or together with the footnote, her personal experience does not transform the OIIG's alleged misconduct into a county policy. *Daniel v. Cook County*, 833 F.3d 728, 734 (7th Cir. 2016) (stating that plaintiff "must show more than the deficiencies specific to [her] own experience"); *Palmer*, 327 F.3d at 596 (noting that "proof of isolated acts of misconduct will not suffice" for *Monell* liability).

Second, even if Blanchard's execution of the County's *Shakman* compliance policy was, as alleged, routinely flawed, Lanahan's *Monell* argument still fails because Blanchard, as the head of an independent agency, does not set policy for the County. Judge Alesia addressed a remarkably similar issue in *Angara v. City of Chicago*, 897 F. Supp. 355, 359-60 (N.D. Ill. 1995). In that case, a city employee alleged that the Office of Inspector General ("IG") improperly surveilled him, shredded exculpatory evidence, and coerced him into confessing to a crime. *Id.* at 357. The employee argued that the city was responsible for the IG's constitutional violations under *Monell* because the IG set policy regarding investigations. In support of his argument, the employee pointed to a municipal ordinance that established the IG office and vested it with decision-making authority over investigations, along with the fact that the IG was solely responsible for promulgating rules and regulations over investigations. *Id.* at 360. Unpersuaded by these considerations, Judge Alesia dismissed the *Monell* claim. *Id.* He found that while the ordinance "conferred a number of powers and duties" on the IG and that the IG clearly held "a position of authority within his office," there was nothing in the record that showed the IG was vested with final policymaking authority ***for the City***. *Id.* (emphasize added).

Lanahan argues that *Angara* compels the conclusion that the OIIG has policymaking authority over the County. She contends that in contrast to the city ordinance in that case, the

relevant county ordinance clearly "confers final policymaking authority on Defendant Blanchard to set and impose policies related to political discrimination and corruption." (Pl. Resp. to OIIG Mot. 8, ECF No. 47.) The Court fails to see how that is so. The ordinance says nothing about the OIIG's policymaking authority; at most, it shows that the office is to operate independently from the County. *See* Cook Cnty, Ill. Code of Ordinances §§ 2-281, 2-282(b), 2-290. In reality, what Lanahan would need to show to establish *Monell* liability based on Blanchard's conduct is that the County co-opted the OIIG's investigatory function. Because the amended complaint does not include any allegations that plausibly support such a theory, the Court finds that Blanchard is not a final policymaker for the County.

The Court therefore finds that the complaint fails to plausibly allege that the retaliation at issue was caused by a policy or practice of the County. And to recap, then, the Court concludes that the complaint adequately alleges a violation of § 1983 based on First Amendment retaliation by all defendants other than Preckwinkle and the County. The complaint, however, does not adequately allege as to any defendant a violation of § 1983 based on due process.

### III.    Title VII – Retaliation

In Count V, Lanahan asserts that the County, as her employer, also violated Title VII by its alleged retaliatory conduct. The sole issue raised by the County with respect to this count is whether Lanahan properly exhausted all of the acts on which she bases her charge of retaliation in violation of Title VII. Although the amended complaint does not clearly define the scope of Lanahan's Title VII theory, it plausibly alleges six retaliatory acts: (1) reclassifying her position as at-will; (2) removing her parking space; (3) denying her pay requests; (4) fraudulently investigating her *Shakman* claims; (5) relocating her to an office further away from her home; and (6) moving her employees to a different location than her. The County argues that none of

these acts can support her claim because they are either time-barred or fall outside the scope of her EEOC charge. (Cnty. Mot. 9-10, ECF No. 46.) Because the Court finds that at least one of the alleged retaliatory acts has been exhausted, the County's challenge to Lanahan's Title VII retaliation theory fails and Count V of the complaint survives.

As a precondition to filing suit under Title VII, plaintiffs must file a charge alleging employment discrimination with the EEOC. *Huri v. Office of the Chief Judge of the Circuit Court of Cook Cnty.*, 804 F.3d 826, 831 (7th Cir. 2015). Any claim for discrimination that is not included in the charge cannot be raised in federal court. *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 726 (7th Cir. 2003). The one exception to this rule is for claims "that are like or reasonably related to the EEOC charge, and can be reasonably expected to grow out of an EEOC investigation of the charges." *Id.* (internal quotation marks and citation omitted). In determining whether claims are reasonably related, courts must construe the charge liberally; "a Title VII plaintiff need not include in her charge every fact that, individually or in combination, forms the basis of a subsequent lawsuit's claims." *Huri*, 804 F.3d at 831 (citing *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994)). At a minimum, though, the claim and the EEOC charge must "describe the same conduct and implicate the same individuals." *Hamzah v. Woodman's Food Mkt., Inc.*, 693 F. App'x 455, 458 (7th Cir. 2017) (quoting *Huri*, 804 F.3d at 831-32). Moreover, in Illinois, a charge must be filed within 300 days of the alleged unlawful employment practice. *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 839 (7th Cir. 2014) (citing 42 U.S.C. § 2000e-5(e)(1)). Any claim not filed within this 300-day period is time-barred, even if it is referenced in the EEOC charge. *See id.*; *Sitar*, 344 F.3d at 726.

Lanahan filed a single charge with the EEOC alleging two forms of retaliation: the reclassification of her position to at-will and the removal of her parking space. (Am. Compl.

¶ 20; EEOC Charge, ECF No. 46-1.)[17] The County argues that both acts are time-barred because they occurred outside of the 300-day window. (Cnty. Mot. 8-9, ECF No. 46.) The County is correct. Lanahan alleges that she lost her merit-based protection in October 2014 and her parking space in March 2015. However, she filed her EEOC charge on October 16, 2016, so anything that occurred prior to December 12, 2015 is untimely. Lanahan retorts that these acts are timely under the doctrines of equitable estoppel and equitable tolling. (Pl. Resp. to Cnty. Mot. 10-12, ECF No. 48.) But she provides no legal support for her argument. As such, her argument is waived. *See Massuda v. Panda Exp., Inc.*, 759 F.3d 779, 783-84 (7th Cir. 2014) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.") (citation omitted).

Even if her argument were not waived, neither doctrine applies. "Equitable estoppel . . . comes into play if the defendant takes active steps to prevent the plaintiff from suing in time, such as by hiding evidence or promising not to plead the statute of limitations." *Thelen v. Marc's Big Boy Corp.*, 64 F.3d 264, 267 (7th Cir. 1995) (internal citation and quotation marks omitted). Equitable tolling applies if the plaintiff is unable to timely obtain enough information to conclude that she has a claim despite all due diligence, or if she makes a good-faith error that causes her complaint to be untimely, such as filing the charge in the wrong place. *Porter v. New Age Servs. Corp.*, 463 F. App'x 582, 584 (7th Cir. 2012). None of those concerns are present here. Lanahan not only filed her initial charge in the right place, she also had all of the information she needed to assert a retaliation claim once she learned that her position was added to the amended policy list and her parking space was taken away. Lanahan suggests that she was

---

[17] Although Lanahan did not attach the EEOC charge to her amended complaint, it is "fair game" for the defendants to reference the charge in their motion since Lanahan refers to the charge in her pleading and the charge is essential to her Title VII claim. *Adams*, 742 F.3d at 729 (citing *Menominee Indian Tribe of Wis. v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998)).

prevented from raising these issues because the OIIG hid payroll records from her during its investigation. (Pl. Resp. to OIIG Mot. 11, ECF No. 48.) But she did not need those records, or any other evidence for that matter, to understand that she had a retaliation claim. Indeed, she asserted a retaliation claim in her *Shakman* complaint based on the reclassification of her position ***before*** she even learned about the payroll records. Therefore, neither of these retaliatory acts were raised in a timely fashion.

The Court turns next to the retaliation allegations that were not included in the EEOC charge. As a preliminary matter, all but one of the uncharged acts, even if reasonably related to the charge, are untimely. The OIIG's investigation concluded in May 2015 and, according to the complaint, Lanahan was moved to another location "[s]hortly after" the OIIG issued its findings.[18] Moreover, while Lanahan claims that she was denied pay raises, she does not allege that any of the defendants denied any requests on or after December 12, 2015. Setting those allegations aside, the Court need only consider whether the decision to relocate Lanahan's employees in May 2016 is reasonably related to the EEOC charge. The Court concludes that it is. Here, Lanahan merely is asserting a new act of employment-related retaliation based on the same protected activity referenced in her charge. Moreover, it is reasonable to assume that the EEOC's investigation in late 2016 would have covered the transfer of Lanahan's employees. And while the complaint indicates that three different employees carried out the various acts, (Am. Compl.

---

[18] The Court also concludes that even if the OIIG hid evidence from Lanahan after May 2015, such alleged misconduct is not reasonably related to the allegations in the EEOC charge. Hiding and falsifying evidence is markedly different then reclassifying an employee's status or taking away her parking space. *Cf. Jansen v. Packing Corp. of Am.*, 895 F. Supp. 1053, 1067 & n.22 (N.D. Ill. 1995), *rev'd on other grounds*, 123 F.3d 490 (7th Cir. 1997) (dismissing retaliation claim based on the slashing of plaintiff's tires where plaintiff raised "drastic[ally] different[]" acts of employment-based retaliation in her EEOC charge). The allegations also are aimed at different sets of defendants—the investigation involved only the OIIG Defendants, whereas the other acts were supposedly carried out some of the Cook County Defendants.

¶¶ 37, 78M, 78O), all three worked for CCHHS, the entity identified in the charge. (EEOC Charge, ECF No. 46-1.) Accordingly, the Court holds that the Title VII retaliation theory may go forward based on the allegation that Lanahan's employees were reorganized and relocated.

## IV.     Gross Negligence

In Count VI, Lanahan asserts that the OIIG Defendants are liable under a state law theory of "gross negligence" based on their failure to properly investigate her political discrimination and retaliation claims. The defendants argue that this theory should be dismissed based on the statute of limitations and because the defendants are shielded by immunity under Illinois law.[19] The Court finds that liability under Illinois tort law for the retaliatory conduct alleged in the complaint is time-barred and, as such, need not address the immunity argument.

The defendants assert that Lanahan's gross negligence theory is governed by the statute of limitations set forth in the Illinois Local Government and Governmental Employees Tort Immunity Act. The Act provides, in pertinent part, that "[n]o civil action . . . may be commenced in any court against a local entity or any of its employees for any injury unless it is commenced within one year from the date that the injury was received or the cause of action accrued." 745 ILCS 10/8-101(a). Lanahan does not dispute the applicability of this statute and the Court sees no reason to look elsewhere as the OIIG Defendants clearly are public employees. (Am. Compl. ¶¶ 17-19); 745 ILCS 10/1-207 ("'Public Employee' means an employee of a local public entity."); 745 ILCS 10/8-206 ("'Local Public Entity' includes a county . . . .").

---

[19] The OIIG Defendants also argue that this theory should be dismissed because Illinois law does not recognize the tort of "gross negligence." But the Court declines to default this claim on that basis. Even if gross negligence is not a tort *per se*, the theory still encompasses ordinary negligence.

Lanahan's original complaint encompassed her retaliation claim,[20] so a violation premised on a theory of gross negligence would be timely only if the limitations period started on or after December 30, 2015 (that is, one year before the original complaint was filed). The defendants insist that because Lanahan suffered her alleged injury when the OIIG issued its findings, the clocked started running when the report was released on May 18, 2015. (OIIG Mot. 13, ECF No. 41.) Lanahan does not address this issue directly, but elsewhere in her brief she represents that she did not know that the OIIG's investigation was conducted in a fraudulent manner until October 18, 2016, when the EPO Report was released. (Pl. Resp. to OIIG Mot. 5, ECF No. 47.) As the defendants point out, however, Lanahan's representation is contradicted by allegations in the amended complaint. Lanahan alleges that the OIIG Report is fraudulent, in part, because it "exclude[d] reference to Plaintiff's discovery of the Vais salary discrepancy." (Am. Compl. ¶ 46.) That is, Lanahan alleges that the findings failed to include evidence relevant to her political discrimination claim that *she* brought to the OIIG's attention *during* its investigation. Based on this allegation, Lanahan was on notice that something was amiss with the OIIG Report when it was issued in May 2015. Because the applicable limitations period had run then, Lanahan cannot premise her retaliation claim on a theory of gross negligence. Count VI is therefore dismissed.

## V.     Respondeat Superior

In Count VII, Lanahan asserts a respondeat superior theory against the County "as principal for all torts committed by its agents." (Am. Compl. ¶ 104.) The amended complaint does not identify whether this count is premised on federal or state law, but in either case it fails.

---

[20] It does not matter whether the original complaint expressly set forth a count alleging "gross negligence" under state law as a basis of liability; the "claim" of retaliation, for which "gross negligence" is but one theory of liability, was asserted in the original complaint.

As discussed above, § 1983 does not permit respondeat superior liability. *See Gill*, 850 F.3d at 344. And because the Court is dismissing the only other tort alleged ("gross negligence"), there is no state-law basis to hold the County liable under a respondeat superior theory. Accordingly, Count VII is dismissed for failure to state a claim.

*     *     *

For the reasons set forth above, the defendants' motions to dismiss Lanahan's retaliation claim are denied. With respect to each count, however, the Court finds as follows. In Count III, Lanahan has adequately pleaded a violation of § 1983 based on First Amendment violations by all defendants other than Preckwinkle and the County, but she has failed to plausibly allege a violation based on due process. In Count V, Lanahan sufficiently alleges a violation of Title VII based on the relocation and reorganization of her employees; she cannot, however, proceed on this theory based on any of the time-barred or unexhausted acts of retaliation. Count VI is barred by the statute of limitations and is therefore dismissed with prejudice. Count VII is dismissed with prejudice to the extent that Lanahan seeks to base respondeat superior liability on § 1983 or a state law theory of gross negligence. Lanahan has leave to file a further amended complaint, consistent with the Court's rulings, no later than May 4, 2018. A status hearing is set for May 15, 2018 at 9:00 a.m.

Date: April 13, 2018

John J. Tharp, Jr.
United States District Judge